309 Ga. 810
FINAL COPY

S20A0984. ELLISON v. THE STATE.

PETERSON, Justice.

Johnathan Edward Ellison was convicted of malice murder for the stabbing death of Antwane Hyatte.[1] Ellison appeals his convictions, arguing that the trial court erred in admitting DNA evidence obtained from a buccal swab performed on him without a warrant while he was in custody. He argues that the admission of

---

[1] Hyatte was killed on March 16, 2011. A Dade County grand jury indicted Ellison on September 8, 2011, for malice murder, felony murder predicated on aggravated assault, felony murder predicated on armed robbery, aggravated assault, and armed robbery. Following an October 2011 trial, the jury found Ellison guilty of malice murder, felony murder predicated on aggravated assault, and aggravated assault, and not guilty of armed robbery and felony murder predicated on armed robbery. The trial court sentenced Ellison to life with the possibility of parole for malice murder. The court purported to merge the felony murder count into the malice murder conviction, but that count was actually vacated by operation of law, see *Johnson v. State*, 292 Ga. 22, 24 (1) (733 SE2d 736) (2012); the aggravated assault count merged into the malice murder conviction. Ellison filed a timely motion for new trial, which the trial court denied on October 16, 2019, after a hearing. Ellison timely appealed, and his case was docketed to this Court's April 2020 term and submitted for a decision on the briefs.

the evidence violated Article I, Section I, Paragraphs XIII[2] and XVI[3] of the Georgia Constitution because he did not knowingly and voluntarily consent to the buccal swab and he was not given any *Miranda*-type[4] warning. But the DNA evidence obtained from Ellison's buccal swab did not match any of the DNA found at the crime scene or inculpate him in any other way, and thus its admission was harmless beyond a reasonable doubt. We therefore affirm.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. On March 16, 2011, Hyatte and his girlfriend, Natoya Lee, drove to Ellison's mobile home; they arrived around 6:30 p.m. and parked directly in front of the home.

---

[2] Paragraph XIII provides:
> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to be searched and the persons or things to be seized.

Ga. Const. of 1983, Art. I, Sec. I, Par. XIII.

[3] Paragraph XVI provides that "[n]o person shall be compelled to give testimony tending in any manner to be self-incriminating." Ga. Const. of 1983, Art. I, Sec. I, Par. XVI.

[4] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

From the passenger seat of the car, Lee observed Ellison and another male inside the mobile home. Hyatte went to the door unarmed and Ellison let him inside; Lee stayed in the car.

Immediately after Hyatte entered, Lee heard a loud noise and saw a flash of light, which she believed to be a gunshot. Lee observed the window blinds moving and thought the men were fighting. Hyatte broke a window with his elbow and motioned to Lee, as though he was telling her to leave. Hyatte then opened the front door, waved to Lee, and fell over. Lee called 911. While on the phone, Lee saw a man flee out of the mobile home and run into the woods behind it.

Police arrived shortly after 7:00 p.m. and discovered Hyatte dead in the doorway. Hyatte had 16 stab wounds, which were later determined to have caused his death. Inside the mobile home, police found blood in the entryway and living room, broken glass from the living room window, and two knives, one covered in blood. Ellison's young children were also found inside. A window in the rear of the mobile home was open and had blood marks indicating that the

suspects had fled out the back.

Around the same time, three people who lived on a nearby street saw Ellison and another man walking down the road. One witness noticed that one of the men was holding his hand, bleeding, and appeared to be cut; although the man had no fishing gear with him, he explained that he cut himself fishing. Bobbie Snow, another neighbor who knew Ellison, testified that shortly after 7:00 p.m., Ellison and another man knocked on her door; the other man's hand was bleeding, and they were both sweaty and seemed scared. Ellison told her that someone was trying to kill them and they needed a ride, and he asked her not to call the police. Snow agreed to drive them. During the drive, Ellison and the other man, James Oglesby, told Snow that they fought someone who tried to rob them and they "beat his ass." Snow dropped the men off at Oglesby's parents' residence in Alabama; Oglesby left blood-stained money in her car. Snow called 911 and spoke to investigators that night.

Oglesby and Ellison cleaned up and burned their clothes at Oglesby's parents' home. Afterward, they asked a neighbor, Colby

Dixon, for a ride, and Dixon agreed. While driving, Dixon heard Oglesby tell someone on the phone that he might be in trouble. Oglesby told Dixon they "beat a dude down" and the man "might not make it." Dixon dropped them off in Tennessee, where the men then got a ride to Whitfield County, Georgia. Police arrested Ellison and Oglesby in Whitfield County on March 17, 2011.

That same day, Ellison made a statement to Whitfield County police. Police read him his *Miranda* rights, and Ellison signed a *Miranda* waiver form. Ellison indicated on the waiver form that he was 19 years old and his last year in school was seventh grade. Ellison was interviewed again on March 21, 2011, and he initialed and signed another waiver form after being read his rights. During the interview, Ellison stated that Oglesby orchestrated the robbery and stabbing and that Oglesby initiated the attack on Hyatte, stabbing him multiple times before emptying his pockets of cash and drugs. Ellison also claimed that Oglesby threatened him to force his cooperation, but Ellison never tried to get away from Oglesby or notify the police after being separated from Oglesby.

On March 22, 2011, investigators went to Ellison's jail cell. One investigator explained that she needed to take a buccal swab from the inside of Ellison's mouth and asked for his consent to do so. Ellison gave permission and signed a form acknowledging the same. Ellison and Oglesby's buccal swabs,[5] as well as DNA from Hyatte, were processed by a GBI forensic DNA analyst and compared to the blood found on the knives recovered from Ellison's trailer. The DNA from one knife matched Hyatte but did not match Ellison or Oglesby. A partial profile obtained from the second knife did not match any of the three men.

1. Ellison does not dispute that the evidence is sufficient to sustain his convictions, but consistent with our usual practice in murder cases, we have independently reviewed the record to assess the legal sufficiency of the evidence.[6] We conclude that the evidence

---

[5] Police obtained Oglesby's buccal swab through a search warrant because Oglesby refused to consent to the buccal swab.

[6] We remind litigants that this Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. ___, ___ (4) (c) (846 SE2d 83) (2020). This Court began assigning cases to the December term on August 3, 2020.

presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Ellison was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); OCGA § 16-2-20 (defining "party to a crime").

2.     Ellison's sole contention on appeal is that the trial court erred by admitting DNA evidence obtained from his buccal swab because the swab was obtained in violation of Article I, Section I, Paragraphs XIII and XVI of the Georgia Constitution.[7] He argues that Paragraph XVI was violated because he was in custody and was not given any *Miranda*-type warning before being asked to perform an incriminating act, and that Paragraph XIII was violated because

---

[7] Ellison filed pretrial motions in limine to exclude all statements and fruits of the interrogations and to exclude evidence of the buccal swabs. A hearing was held on these and other motions. The trial court denied the motions in limine, finding that the statements were made freely and voluntarily, and that the buccal swabs were given with voluntary consent, explaining "based on the totality of the circumstances that [Ellison] had two prior *Miranda* warnings and meetings with these officers and that this was freely and voluntarily given by the defendant."

he did not knowingly and voluntarily consent to the warrantless search.[8]

But we need not decide whether the trial court erred in admitting the DNA evidence from Ellison's buccal swab because it made no difference to the outcome of his trial. If there is "no reasonable possibility that the evidence may have contributed to the verdict," any error is "harmless beyond a reasonable doubt" and does not warrant reversal. *Ramirez v. State*, 279 Ga. 569, 575 (6) (619 SE2d 668) (2005).

There was no reasonable possibility that the DNA evidence contributed to the verdict here because the evidence was exculpatory rather than incriminating. See *Wilson v. Zant*, 249 Ga. 373, 377 (1) (290 SE2d 442) (1982) (whether a defendant's statement is

---

[8] Although none of Ellison's claims are strong, we take this opportunity to point out that his *Miranda* argument rests heavily on *Price v. State*, 269 Ga. 222 (498 SE2d 262) (1998), a case that we explicitly overruled last year. In *State v. Turnquest*, 305 Ga. 758 (827 SE2d 865) (2019), we made clear that neither the Georgia right against compelled self-incrimination, the Georgia right to due process, nor a Georgia statute prohibiting compelled self-incrimination requires law enforcement to warn suspects in custody of their right to refuse to perform an incriminating act. See id. at 771 (3) (c), 774-775 (4) (overruling *Price*).

exculpatory or incriminating is material for the purpose of determining if error is harmful or harmless), disapproved on other grounds by *Morgan v. State*, 267 Ga. 203, 204-205 (2) (476 SE2d 747) (1996). The DNA evidence obtained from the buccal swab did not match any of the evidence gathered from the crime scene. The crime scene DNA excluded both Ellison and Oglesby and provided a partial profile of an unidentified individual. Indeed, Ellison used this information in his defense, as his trial counsel argued in closing that there was a "mystery guest" who was in the home and committed the murder.

The only argument Ellison makes about harm is that the State's effort to obtain DNA evidence showed the jury that the State's investigation was thorough, and prevented him from arguing that the State's case had an evidentiary "hole" due to an incomplete investigation. But incomplete investigations merely allow defendants to invite jurors to speculate about what a complete investigation might have revealed. Here, the DNA evidence actually revealed what a defendant would have hoped the jurors would have

speculated about in the absence of such evidence: Ellison's DNA was not present at the scene and that of an unidentified third party was. The admission of the DNA evidence did not harm Ellison in any way, and his claim fails.

*Judgment affirmed. All the Justices concur.*


Decided September 8, 2020.

Murder. Dade Superior Court. Before Judge House.
*Brett W. Ladd*, for appellant.
*Herbert E. Franklin, Jr., District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth Rosenwasser, Assistant Attorney General*, for appellee.