THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY WINSETT, Defendant-Appellant.

Second District   No. 2—90—0481

Opinion filed November 27, 1991.

REINHARD, P.J., dissenting.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, and Robert Agostinelli, Frank W. Ralph, and Stephen Omolecki, all of State Appellate Defender's Office, of Ottawa, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, John X. Breslin, and Rita Kennedy Mertel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

After a hearing on April 25, 1990, the circuit court of Lake County denied defendant's post-conviction petition, which arose from his convictions of attempted murder (Ill. Rev. Stat. 1985, ch. 38, par. 8—4(a)), solicitation of murder (Ill. Rev. Stat. 1985, ch. 38, par. 8—1(a)), and conspiracy to commit murder (Ill. Rev. Stat. 1985, ch. 38, par. 8—2(a)). Defendant appeals and asserts that the circuit court erred in denying his post-conviction petition because the trial court improperly denied defendant's motion to suppress the testimony of another putative defendant, Glenn Spruille, discovered as a fruit of defendant's unconstitutionally obtained statements.

On April 10, 1985, defendant was indicted in the circuit court of Lake County. The indictment alleged that David R. Robinson paid defendant $20,000 to kill Arturo Zarinana, the husband of Robinson's paramour. Defendant, in turn, agreed to pay Spruille $2,000 to kill Zarinana.

Defendant was arrested at his home on February 20, 1985, at approximately 5 p.m. by two plainclothes detectives from the Waukegan police department, who were driving an unmarked police car. Two Round Lake Beach officers, who were also in plainclothes and driving an unmarked car, assisted the Waukegan police in the arrest. After the detectives asked defendant to step into the living room and placed him under arrest, defendant told one of the detectives "I want a law-

yer." Defendant then immediately turned or inclined his head toward his wife, who had followed the officers into the living room, and said "Call Bajko," who was defendant's attorney. Defendant's six children, sister-in-law, brother-in-law, and nephew, who were standing in the doorway between the adjoining dining room and the living room, overheard this conversation.

As the detectives escorted defendant from the house, defendant again said "Call Bajko" to his wife. In response to defendant's wife's questions about what would happen, the officers advised her that defendant would be allowed to phone her after he was booked and, further, that they were taking defendant to the Lake County Building, which houses the Lake County sheriff's office. After waiting a half hour without word from her husband, defendant's wife phoned the Lake County sheriff's office, which had no record of defendant's arrest. However, because it occasionally performed arrests for other departments, the Lake County sheriff's office advised defendant's wife to wait another half hour and call it again. During that time, defendant's wife phoned attorney Bajko's office, but there was no answer. She then phoned the Lake County sheriff's office again, which suggested she call local police departments in the area to attempt to locate her husband, which she did without success. Defendant's wife again contacted the Lake County sheriff, who offered to attempt to locate defendant.

Defendant's wife then called the local junior college, at which attorney Bajko taught and where defendant had met him. Although attorney Bajko was not on campus that evening, the receptionist took defendant's wife's name and phone number and attempted to relay a message to attorney Bajko after learning the nature of the emergency that existed. The receptionist testified that after several unsuccessful attempts she eventually reached attorney Bajko, who then contacted defendant's wife.

Defendant testified that upon arrival at the Waukegan police station he was placed in an interview room, the handcuffs were removed, and his personal property was inventoried. At that time he was read his rights, and the officer who did so completed a waiver form, including the time, and checked each item off as defendant indicated that he understood his rights. Defendant, however, refused to sign the waiver and told the officer he was unwilling to answer questions or make statements until defendant spoke with his attorney. As the officers continued to ask questions over the next 2 to 2½ hours, defendant requested his attorney another three times. Defendant eventually made statements, and he was then again presented with the wavier

form to sign, at which time he did so. Defendant was then allowed to call his wife, which occurred at 8:35 p.m. as indicated on their telephone bill. Defendant's wife then contacted attorney Bajko, who later arrived and advised defendant not to sign the statements.

Each of the four officers denied that defendant had asked for an attorney at his home, either in the living room or as defendant was leaving the house, and the Waukegan officers testified that defendant's wife was told he was being taken to the Waukegan police station. The officer who read defendant his rights testified that defendant immediately signed the waiver, and both Waukegan officers testified that defendant did not at any time request an attorney during their questioning. Defendant was allowed to make a phone call to his wife when he requested to do so, but was not advised that he could make such a call prior to his request.

At the April 18, 1985, hearing on defendant's motion to suppress evidence of his statements, the court found defendant's witnesses, who included not only defendant himself, but his wife, two teenage daughters, and sister-in-law, "extremely credible." Although expressly finding that defendant's statements were neither involuntary for purposes of possible impeachment under *Harris v. New York* (1971), 401 U.S. 222, 225-26, 28 L. Ed. 2d 1, 4-5, 91 S. Ct. 643, 645-46, nor the result of police trickery or coercion, the court granted defendant's motion to suppress his statements because they were given after defendant had requested counsel. (See *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) No interlocutory appeal was taken by the State from this ruling.

On May 28, 1985, defendant filed a motion *in limine* to suppress evidence obtained as a result of his statements. Specifically, defendant sought to exclude "any and all testimony of GLEN [*sic*] SPRUILLE as it relates to Defendant, LARRY WINSETT, for the reason that said testimony and said evidence was a direct result of statements elicited from Defendant, LARRY WINSETT, and said statements have heretofore been ruled inadmissible by this Court." At the hearing on the motion *in limine*, defendant argued that the evidence was the "fruit of the poisonous tree and that the police and State should not benefit from any illegal activities on their part." The trial court found that the present state of the law was such that the motion was not well taken and denied the motion.

At trial, testimony revealed that Robinson was having an affair with Zarinana's wife and had attempted to hire somebody to kill Zarinana. Several employees and former employees of Robinson, including Spruille, were solicited to kill Zarinana. Spruille testified that

defendant gave him a $1,000 down payment and defendant was to give him "another thousand after it's finished." According to Spruille, defendant gave him a description of Zarinana. Spruille testified that he shot Zarinana four times, although not fatally, and Spruille collected the rest of the money from defendant.

The jury found defendant guilty. On June 27, 1985, defendant filed a post-trial motion that included as a ground for a new trial the trial court's denial of the motion *in limine* to exclude evidence gained as the "fruit" of defendant's unconstitutionally obtained statements. The motion was denied, and defendant was sentenced to concurrent terms of 40 years' imprisonment for the convictions of attempted murder and solicitation and 14 years' imprisonment for conspiracy.

On his direct appeal to this court, defendant's appellate counsel did not raise as an issue the trial court's denial of defendant's motion *in limine* to exclude evidence obtained as a result of his suppressed statements, and this court affirmed defendant's convictions. (*People v. Winsett* (1986), 147 Ill. App. 3d 1161, 512 N.E.2d 138 (unpublished order under Supreme Court Rule 23).) On February 1, 1990, defendant filed an amended petition for post-conviction relief (Ill. Rev. Stat. 1989, ch. 38, par. 122—1 *et seq.*) claiming that the testimonial evidence of Spruille obtained as a result of the suppressed statements should also have been suppressed.

At the hearing on defendant's amended petition for post-conviction relief, Michael Fusz, the chief of felony review with the Lake County State's Attorney in 1985, testified that based on his review of the record there was nothing in the police reports that indicated that the victim could have identified Spruille, nor were there any eyewitnesses that identified Spruille as the shooter. According to Fusz, there was no indication that the Waukegan police department was aware of Spruille relative to the Zarinana shooting prior to defendant's February 20, 1985, arrest and statements, which directly linked Spruille to the offense. However, the investigation, including the interviews with Robinson's employees, would have continued absent defendant's statements.

Detective Donald Meadie of the Waukegan police department testified that he first learned who shot Zarinana on February 20, 1985, during Meadie's interrogation of defendant. Zarinana himself was unable to identify his attacker because the attacker wore a ski mask. A witness, who saw an unfamiliar man in the area immediately following the shooting, was equally unable to provide more than a description of the man's clothes and indicated he would not recognize the man again except for his clothes. Thus, although there were sev-

eral leads prior to defendant's arrest and statements, none identified Spruille as a suspect. Robert Thatcher, an employee of Robinson's, provided Meadie with Spruille's name as a former Robinson employee, but Meadie's report of his interview with Thatcher failed to include Spruille's name. However, Thatcher neither provided Meadie with information as to who actually shot Zarinana nor indicated that Spruille was involved in the offense. The police were in the process of interviewing all of Robinson's past and present employees, but none had identified Spruille as involved in the shooting. Meadie admitted that there were no witnesses to the shooting, and without defendant's statements, the police did not know that Spruille was linked to the shooting. However, the investigation would have continued if defendant had not identified Spruille as the shooter.

In denying defendant's post-conviction petition, the trial court found that the State had met its burden of showing inevitable discovery and that there was no constitutional violation. The trial judge stated the following:

> "My interpretation of what the law presently is under the constitution and the intention of the Supreme Court, I am looking at all of their cases, I am absolutely convinced that they would find that this was not the nature of a constitutional violation so as to preclude their being able to use this evidence. I feel that the State's argument is well taken and that they wouldn't have to prove inevitability, but that issue is moot since they did do it. Might as well have a finding for the higher court."

On appeal, defendant contends that he was denied the effective assistance of counsel because his appellate counsel on direct appeal failed to raise the trial court's denial of defendant's motion to suppress the evidence obtained as a result of defendant's suppressed statements. Defendant contends that the testimony of Spruille must be suppressed as the fruit of the poisonous tree because it was derived from defendant's unconstitutional interrogation in violation of his fifth and sixth amendment rights to counsel. Defendant alternatively argues that the trial court also erroneously found that Spruille would have been inevitably discovered.

The State initially contends that defendant has waived this issue by not raising it on direct appeal to this court. The State, citing *Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357, as direct authority to support the trial court's order denying suppression of Spruille's testimony, contends that appellate counsel, in view of this authority, was not ineffective for failing to raise the issue. The

State also contends that the evidence was properly admitted under the inevitable discovery exception to the exclusionary rule.

As to the waiver argument, a post-conviction claim that could have been presented to the reviewing court in the direct appeal is, if not presented, thereafter barred under the doctrine of waiver. (*People v. Silagy* (1987), 116 Ill. 2d 357, 365, 507 N.E.2d 830.) However, because defendant has raised this issue in a claim of ineffective assistance of counsel due to appellate counsel's failure to raise the issue on direct appeal, the issue is not waived. (*People v. Barnard* (1984), 104 Ill. 2d 218, 229-30, 470 N.E.2d 1005.) We, therefore, address the substance of defendant's claims in the context of his assertion of ineffective assistance of counsel on his direct appeal.

■■ Defendant initially contends that his sixth amendment right to counsel was violated, relying on *Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, and that the fruits of that violation should be suppressed. This claim is without merit because *Escobedo* has been limited to its unique facts. (*Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882.) Although the instant facts are strikingly similar to those of *Escobedo*, the sixth amendment right to counsel has been held to attach only at or after the initiation of adversary judicial criminal proceedings, whether by way of formal charge, preliminary hearing, indictment, information or arraignment (*Kirby*, 406 U.S. at 689, 32 L. Ed. 2d at 417, 92 S. Ct. at 1882) when the government's role shifts from investigation to accusation. *Moran v. Burbine* (1986), 475 U.S. 412, 430, 89 L. Ed. 2d 410, 427, 106 S. Ct. 1135, 1146.

In Illinois, our supreme court has, therefore, held that the sixth amendment right to counsel has not attached when a defendant was being interrogated on a complaint charging him with an offense, and he has been neither indicted nor arraigned. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 433, 521 N.E.2d 38; *People v. Wilson* (1987), 116 Ill. 2d 29, 50-51, 506 N.E.2d 571.) Thus, defendant's sixth amendment right to counsel had not yet attached because defendant, although arrested based on a warrant, had not been indicted or arraigned. However, our analysis proceeds under the fifth amendment right to counsel rather than a sixth amendment right to counsel analysis, because "[i]t is well established that the right to counsel provided by the sixth amendment exists independently of those rights under the fifth amendment." *Thompkins*, 121 Ill. 2d at 432, 521 N.E.2d at 51.

Neither defendant nor the State has cited any Illinois authority on the exclusion of the fruit of a fifth amendment violation, and our inde-

pendent research also has failed to disclose any relevant Illinois precedent on this precise issue. The United States Supreme Court has not squarely decided the issue (*Commonwealth v. White* (1978), 439 U.S. 280, 58 L. Ed. 2d 519, 99 S. Ct. 712 (suppression of fruit of fifth amendment violation summarily affirmed by divided court)), and other Federal and State court decisions have been divided on this precise question. (See *e.g., United States v. Downing* (1st Cir. 1981), 665 F.2d 404 (suppressed); *Commonwealth v. White* (1977), 374 Mass. 132, 371 N.E.2d 777 (suppressed); *Wilson v. Zant* (1982), 249 Ga. 373, 377-79, 290 S.E.2d 442, 446-48 (not suppressed), *cert. denied* (1982), 459 U.S. 1092, 74 L. Ed. 2d 940, 103 S. Ct. 580; see generally 1 W. LaFave & J. Israel, Criminal Procedure §9.5 (1984 & Supp. 1991); Note, *Miranda Right-to-Counsel Violations & the Fruit of the Poisonous Tree Doctrine*, 62 Ind. L.J. 1061 (1987).) Our analysis must, therefore, begin with the Supreme Court's decision in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, which established the criteria to determine if a defendant's ostensibly voluntarily obtained statements must nevertheless be suppressed.

In *Miranda*, the Supreme Court announced a series of procedural safeguards necessary to inform an accused of his right to remain silent and to assure the opportunity to exercise such right. (*Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 706-07, 86 S. Ct. at 1612.) The now familiar *Miranda* warnings adopted by the Court to safeguard an accused's fifth amendment right against compulsory self-incrimination include both a warning of the accused's right to remain silent and that any statements thereafter made may be used as evidence against the accused and a warning that the accused is entitled to counsel, either retained or appointed. (*Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 706-07, 86 S. Ct. at 1612.) *Miranda*'s safeguards have since been distinguished from the constitutional privilege against compulsory self-incrimination itself. (*Tucker*, 417 U.S. at 445-46, 41 L. Ed. 2d at 193-94, 94 S. Ct. at 2364-65.) The right to the presence of counsel, in addition to the actual giving of the *Miranda* warnings, has also been held a prophylactic measure designed to counteract the "inherently compelling pressures" of custodial interrogation. (*McNeil v. Wisconsin* (1991), 501 U.S. 171, 176, 115 L. Ed. 2d 158, 167, 111 S. Ct. 2204, 2208 (discussing distinction between the sixth amendment's constitutional right to counsel at trial and *Miranda*'s fifth amendment right to counsel as a safeguard of constitutional right against self-incrimination).) However, the critical and unique nature of the right to the presence of counsel has also been recognized. *Edwards*, 451 U.S. at 485, 68 L. Ed. 2d at 386-87, 101 S. Ct. at 1885; *Fare v. Michael C.*

(1979), 442 U.S. 707, 716-19, 61 L. Ed. 2d 197, 207-09, 99 S. Ct. 2560, 2567-69; see also *Miranda*, 384 U.S. at 469, 16 L. Ed. 2d at 720-21, 86 S. Ct. at 1625.

In *Tucker* and the Court's similar decision in *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285, which are relied upon by the State as controlling precedent defeating any claim of ineffective assistance of counsel, an infringement of defendant's prophylactic *Miranda* right to the presence of counsel, although requiring suppression of defendant's exculpatory statements, did not require suppression of evidence obtained as a result of such statements. However, the *Tucker* Court's analysis was based on two distinctions, which were critical to its analysis and, further, which are absent here.

First, the constitutional rights of the defendant in *Tucker* had *not* been violated because he had *not* requested counsel. (*Tucker*, 417 U.S. at 444-45, 41 L. Ed. 2d at 193-94, 94 S. Ct. at 2364-65.) In *Tucker* the defendant was arrested prior to the Court's decision in *Miranda*, although his trial commenced after that decision, and *Miranda* was, thus, applicable. (*Tucker*, 417 U.S. at 435, 41 L. Ed. 2d at 187, 94 S. Ct. at 2359; *Johnson v. New Jersey* (1966), 384 U.S. 719, 733, 16 L. Ed. 2d 882, 892, 86 S. Ct. 1772, 1781 (*Miranda* and *Escobedo* applicable to trials commenced after those decisions announced).) At the time of the defendant's arrest and in accordance with *Escobedo* as the only then applicable law, the police asked the defendant if he understood the crime with which he had been charged and advised the defendant of his right to remain silent, that any statements that he did make could be used as evidence against him, and that he had the right to counsel during questioning. (*Tucker*, 417 U.S. at 436, 444-45, 41 L. Ed. 2d at 188, 193, 94 S. Ct. at 2359-60, 2364.) The defendant responded that he understood both the crime with which he was charged and his constitutional rights and that he did not wish counsel. (*Tucker*, 417 U.S. at 436, 41 L. Ed. 2d at 188, 94 S. Ct. at 2359-60.) Thus, the defendant did not request counsel and did not assert his fifth amendment privilege against self-incrimination. However, the officers did not advise the defendant that counsel would be appointed for him if he could not afford to retain private counsel as *Miranda* subsequently required. *Tucker*, 417 U.S. at 436, 41 L. Ed. 2d at 188, 94 S. Ct. at 2359-60.

After indicating that he did not wish counsel, the defendant was then interrogated and provided police with exculpatory statements, including the name of an alibi witness. (*Tucker*, 417 U.S. at 436, 41 L. Ed. 2d at 188, 94 S. Ct. at 2360.) However, the witness instead provided inculpatory information. (*Tucker*, 417 U.S. at 436-37, 41 L. Ed.

2d at 188, 94 S. Ct. at 2360.) Although the defendant's statements were excluded, the witness was allowed to testify, and the defendant was convicted. (*Tucker*, 417 U.S. at 437, 41 L. Ed. 2d at 188-89, 94 S. Ct. at 2360.) Based on these facts, the Court concluded that defendant's exculpatory statements were voluntary and that only the procedural rules of *Miranda* had been disregarded, albeit inadvertently. *Tucker*, 417 U.S. at 445-46, 41 L. Ed. 2d at 193-94, 94 S. Ct. at 2364-65.

■ However, " 'fruits' of police conduct which *actually* infringed a defendant's Fourth Amendment rights must be suppressed," and the Court in *Tucker* recognized that such analysis applied in the context of a defendant's fifth amendment rights as well. (Emphasis added.) (*Tucker*, 417 U.S. at 445, 41 L. Ed. 2d at 194, 94 S. Ct. at 2364.) Police interrogation after an accused requests counsel is an actual violation of the accused's fifth amendment rights because "an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights." (*Fare*, 442 U.S. at 719, 61 L. Ed. 2d at 209, 99 S. Ct. at 2569; see also *Miranda*, 384 U.S. at 469, 16 L. Ed. 2d at 720-21, 86 S. Ct. at 1625; *Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85.) Thus in contrast to *Tucker* in this instance, when defendant invoked his *Miranda* right to counsel, he exercised his constitutional privilege against compulsory self-incrimination, and the police interrogation in face of such exercise was a violation of defendant's constitutional right. Therefore, Spruille's testimony, as the "fruit" of the actual violation of defendant's fifth amendment privilege, should have been suppressed.

However, the conclusion that the defendant's statements had been voluntary did not end the Court's analysis in *Tucker*, which is the second distinction made by the Court. Although only the defendant's *Miranda* rights had been violated, the Court nevertheless examined the matter as a question of principle and focused on the purpose of the exclusionary rule and whether the sanction of exclusion of the "fruit" of the defendant's statements would serve a valid and useful purpose under the facts of that case. *Tucker*, 417 U.S. at 445-46, 41 L. Ed. 2d at 193-94, 94 S. Ct. at 2364-65.

The prime purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate constitutional guarantees. (*Tucker*, 417 U.S. at 446, 41 L. Ed. 2d at 194, 94 S. Ct. at 2365; *United States v. Calandra* (1974), 414 U.S. 338, 347, 38 L. Ed. 2d 561, 571, 94 S. Ct. 613, 619-20.) The exclusionary rule compels respect for constitutional guarantees by removing the incentive to disregard such rights. (*Tucker*, 417 U.S. at 446, 41 L. Ed. 2d at 194, 94 S.

Ct. at 2365.) Therefore, the exclusionary rule necessarily assumes that the police have engaged in willful or negligent conduct, which has deprived an accused of his constitutional rights. (*Tucker*, 417 U.S. at 447, 41 L. Ed. 2d at 194, 94 S. Ct. at 2365.) However, if the police conduct was undertaken in good faith, little deterrence can be accomplished through exclusion of evidence. (*Tucker*, 417 U.S. at 447, 41 L. Ed. 2d at 194, 94 S. Ct. at 2365.) The Court expressly concluded that "[i]n a proper case [the deterrent] rationale would seem applicable to the Fifth Amendment context as well." *Tucker*, 417 U.S. at 447, 41 L. Ed. 2d at 194, 94 S. Ct. at 2365.

The Court again relied on the unusual circumstances in which *Tucker* arose. (*Tucker*, 417 U.S. at 446, 450, 41 L. Ed. 2d at 194, 196, 94 S. Ct. at 2365, 2367.) Applying its analysis of the purpose of the exclusionary rule to the facts of *Tucker*, the Court expressly considered it "significant" to their decision that the police misconduct occurred prior to *Miranda* and, further, that the police had fully provided all then applicable safeguards to ensure that the defendant's decision to waive his fifth amendment privilege was voluntary. (*Tucker*, 417 U.S. at 447, 41 L. Ed. 2d at 195, 94 S. Ct. at 2365.) The Court found that the minimal deterrent effect on future police conduct of the exclusion of the defendant's statements would not be significantly increased by also excluding the "fruit" of such statements. *Tucker*, 417 U.S. at 448, 41 L. Ed. 2d at 195, 94 S. Ct. at 2365-66.

Nor did the Court find that exclusion of the "fruit" of the defendant's suppressed statements would serve the secondary purpose of the exclusionary rule, which is to protect the court from inculpatory evidence that is untrustworthy because it was compelled and involuntary. (*Tucker*, 417 U.S. at 448, 41 L. Ed. 2d at 195, 94 S. Ct. at 2366.) However, in *Tucker*, the Court emphasized that the defendant's statements were neither compelled nor involuntary. (*Tucker*, 417 U.S. at 445, 448, 41 L. Ed. 2d at 193, 195, 94 S. Ct. at 2364, 2366.) The defendant's statements were not inculpatory and contained no self-incrimination. Rather, the defendant's statements contained an exculpatory alibi, which was contradicted by the witness identified in the defendant's statements. (*Tucker*, 417 U.S. at 445, 448, 41 L. Ed. 2d at 193, 195, 94 S. Ct. at 2364, 2366.) Here, not only was defendant's inculpatory statement identifying Spruille, a putative defendant who eventually testified against defendant, inculpatory and subject to the inherent untrustworthiness of compulsory self-incrimination, but it was by definition involuntary and compelled because defendant's request for counsel prior to questioning was a *per se* invocation of his

fifth amendment privilege against compulsory self-incrimination. *Fare*, 442 U.S. at 719, 61 L. Ed. 2d at 208-09, 99 S. Ct. at 2568-69.

*Elstad* similarly concerned only the prophylactic warnings of *Miranda*. In *Elstad*, the suppressed statement of the defendant was made prior to the police giving the defendant any warnings, and the "fruit" of that statement was a complete statement obtained after *Miranda* warnings had been given. (*Elstad*, 470 U.S. at 301, 84 L. Ed. 2d at 227, 105 S. Ct. at 1288-89.) However, *Elstad*, like *Tucker*, concerned neither an actual violation of the defendant's constitutional privilege against self-incrimination nor willful police conduct, which application of the "fruit of the poisonous tree" exclusionary rule will deter. (*Elstad*, 470 U.S. at 315-16, 84 L. Ed. 2d at 236-37, 105 S. Ct. at 1296-97 (second statement was "voluntary" and improper police conduct was an "oversight").) In contrast to both *Elstad* and *Tucker*, this instance was both an "actual" violation of defendant's constitutional rights against self-incrimination and the "proper case" in which the deterrent purpose of the exclusionary rule will be served by the imposition of the sanction to exclude testimony of putative defendant Spruille as the "fruit" of defendant's illegally-obtained statements.

■ The State argued a second basis for affirmance of the trial court's denial of defendant's motion to suppress the testimony of a putative defendant, which was that the police would inevitably have discovered the identity of Spruille. Unconstitutionally obtained physical evidence may nevertheless be admissible at trial in the State's case in chief if it inevitably would have been discovered. (*Nix v. Williams* (1984), 467 U.S. 431, 448, 81 L. Ed. 2d 377, 390, 104 S. Ct. 2501, 2511.) Three criteria must be met before a court will find that evidence would have been inevitably discovered: (1) the condition of the evidence when actually found by lawful means would have been the same as that when improperly obtained; (2) the evidence would have been discovered through an independent line of investigation untainted by the illegal conduct; and (3) such line of investigation must have already been undertaken at the time the evidence was unconstitutionally obtained. *Nix*, 467 U.S. at 459, 81 L. Ed. 2d at 398, 104 S. Ct. at 2517 (Brennan, J., dissenting) (State should bear burden of clear and convincing evidence of inevitability of discovery).

These criteria have clear application in the case of physical evidence. However, when the evidence sought to be suppressed is that of a witness' testimony, the application of the criteria becomes significantly more difficult. Thus, although verbal evidence is equally subject to the "fruit of the poisonous tree" exclusionary rule (*Wong Sun v. United States* (1963), 371 U.S. 471, 485, 9 L. Ed. 2d 441, 454, 83 S.

Ct. 407, 416), other factors must be considered in determining if such evidence inevitably would have been discovered. *United States v. Ceccolini* (1978), 435 U.S. 268, 275, 55 L. Ed. 2d 268, 276, 98 S. Ct. 1054, 1059.

In addition to examining the exclusionary rule's deterrent purpose, the other factors that must be weighed when the challenged evidence is a witness' testimony are the degree of the witness' exercise of free will, the witness' lack of relationship with the defendant, and the use of the suppressed evidence in questioning. (*Ceccolini*, 435 U.S. at 275, 276, 278-79, 55 L. Ed. 2d at 276, 277, 278-79, 98 S. Ct. at 1059-60, 1060, 1061-62.) Thus, in *Ceccolini*, the Court declined to exclude the witness' testimony because the witness testified of her own free will, was not a putative defendant, the unconstitutionally obtained evidence played no part in her questioning, and the cost to society of excluding such testimony outweighed the incremental enhancement of constitutional values such exclusion would foster. *Ceccolini*, 435 U.S. at 275, 276, 279, 55 L. Ed. 2d at 276, 277, 279, 98 S. Ct. at 1059-60, 1060, 1061-62.

■■ In this instance the State was in the process of interviewing all of Robinson's employees, and Spruille, as a former employee, would inevitably have been interviewed. In addition, one of the officers testified that he had been provided Spruille's name by another of Robinson's employees, although the officer had failed to note this information in his report of the interview with such employee. Thus, the State correctly asserts that a separate line of its investigation, already undertaken at the time of defendant's statements and identification of Spruille, would have inevitably led to Spruille.

However, it is at this juncture that the distinction between physical evidence and the testimony of a witness becomes apparent, and the *Ceccolini* factors must be considered. As discussed above and in contrast to *Ceccolini*, the exclusion of Spruille's testimony serves the deterrent purpose of the exclusionary rule to ensure that the fifth amendment's guarantee against compulsory self-incrimination is not willfully violated in the future for the purpose of obtaining derivative evidence that would thus be admissible. In addition, the other factors present in *Ceccolini* that permitted admission of the challenged testimony are absent here as well. Spruille was a putative defendant, and defendant's suppressed statements were used both in questioning Spruille and to induce him to testify against defendant. Thus, although Spruille's identity would inevitably have been discovered, the evidence he provided would not have been obtained without the use of defendant's unconstitutional statements. The trial court, therefore,

improperly denied defendant's motion to suppress Spruille's testimony.

Defendant's convictions are reversed, his sentences are vacated, and this cause is remanded for a new trial excluding the evidence not only of defendant's statements but also of Spruille's testimony.

Reversed and remanded.

BOWMAN, J., concurs.

PRESIDING JUSTICE REINHARD, dissenting:

Although the main question presented in this appeal has not yet been squarely decided by the United States Supreme Court nor addressed by any Illinois reviewing court, I am not persuaded that this court should create an exclusionary rule to bar testimony of a prosecution witness discovered as a fruit of defendant's confession where the confession itself was found by the trial court to be voluntary but was suppressed because it was given after defendant had requested counsel.

Two United States Supreme Court decisions, however, are helpful in the analysis of the general issue of suppression of the fruits of a voluntary statement taken in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, although neither case involved a specific request for counsel as was found here by the trial court.

In *Michigan v. Tucker* (1974), 417 U.S. 433, 41 L. Ed. 2d 182, 94 S. Ct. 2357, cited by the State, the Court noted that *Miranda* warnings are not themselves constitutional rights but are merely prophylactic standards which protect the privilege against self-incrimination. (*Tucker*, 417 U.S. at 446, 41 L. Ed. 2d at 194, 94 S. Ct. at 2364-65.) Thus, in *Tucker*, the Court refused to extend a fourth amendment *Wong Sun* fruit of the poisonous tree analysis to prevent the testimony of a witness whose identity was discovered as a result of a statement taken from the defendant without the benefit of complete *Miranda* warnings and balanced the interests in allowing the evidence. *Tucker*, 417 U.S. at 450-52, 41 L. Ed. 2d at 196-97, 94 S. Ct. at 2367-68.

Similarly, in *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285, the defendant made an inculpatory statement after being initially questioned without any *Miranda* warnings. The defendant was then subsequently given *Miranda* warnings and again interrogated. Although the Court found that the initial unwarned

statement had to be suppressed, it declined to extend the *Wong Sun* analysis to the subsequent statements given after the warnings. (*Elstad*, 470 U.S. at 308, 84 L. Ed. 2d at 232, 105 S. Ct. at 1292-93.) The Court reiterated that *Miranda* warnings are merely prophylactic procedures. (*Elstad*, 470 U.S. at 309, 84 L. Ed. 2d at 232, 105 S. Ct. at 1293.) The court noted that, as in *Tucker*, the absence of any coercion or improper tactics undercut the rationale of the fifth amendment, assuring trustworthy evidence, and the general goal of deterring police misconduct, for invoking a broader rule of excluding evidence. *Elstad*, 470 U.S. at 308, 84 L. Ed. 2d at 231-32, 105 S. Ct. at 1292-93.

As the majority correctly points out, the United States Supreme Court has not squarely decided the issue presented and other Federal and State court decisions are divided on this precise question. Those courts which have suppressed evidence obtained (beyond the confession itself) as a result of a fifth amendment violation of a request for counsel have expressed the view that the justification for the exclusion of evidence is to deter unconstitutional police conduct and have applied a fourth amendment exclusionary rule under *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407. (*United States v. Downing* (1st Cir. 1981), 665 F.2d 404, 408-09; *Commonwealth v. White* (1977), 374 Mass. 132, 138-39, 371 N.E.2d 777, 781.) In contrast, the rationale used in not applying the fourth amendment "fruit of the poisonous tree" exclusion of resulting evidence is that the Supreme Court has never extended the exclusionary rule to a voluntary *Miranda*-tainted confession and that a violation of *Miranda* or the *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, rule of invocation of the right to counsel is not an infringement of a constitutional right which should lead to the suppression of other evidence resulting from the suppressed statement, but is a violation of only the prophylactic rules developed to protect those rights. *Wilson v. Zant* (1982), 249 Ga. 373, 378, 290 S.E.2d 442, 447.

In my view, the decisions of the United States Supreme Court in *Tucker* and *Elstad* which have refused to extend the fourth amendment exclusionary rule to the fruits of a noncoercive statement where the *Miranda* warnings were not given or incompletely given lend support for not adopting an exclusionary rule here where defendant requested counsel but later gave a voluntary statement. The violation was not of the fifth amendment constitutional right but of a prophylactic rule designed to implement that right (see *McNeil v. Wisconsin* (1991), 501 U.S. 171, 176, 115 L. Ed. 2d 158, 167, 111 S. Ct. 2204,

2208; see also *Smith v. Illinois* (1984), 469 U.S. 91, 95, 83 L. Ed. 2d 488, 493, 105 S. Ct. 490, 492 (*Edwards* holding referred to as "prophylactic rule")), and I am reluctant to create an exclusionary rule for such a violation absent the unequivocal authority of the Supreme Court or the Illinois Supreme Court. Accordingly, I would not adopt an exclusionary rule to testimonial evidence of a third-party witness derived from a voluntary statement obtained after a request for counsel in violation of *Edwards v. Arizona*. See *Wilson*, 249 Ga. at 378, 290 S.E.2d at 447.

Because I would affirm the case under the foregoing analysis, I need not examine the State's alternative argument that the witness' testimony would have been admissible under the inevitable discovery rule except to note that I would not agree with the trial court that the evidentiary testimony obtained from Spruille would have been inevitably discovered under the rule announced in *Nix v. Williams* (1984), 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501.